CHICAGO UNION TRACTION CO. v. STATE BOARD OF EQUALIZATION
et al. CHICAGO CONSOL. TRACTION CO. v. SAME.

(Circuit Court, S. D. Illinois. April 4, 1902.)

SOUTH CHICAGO CITY RY. CO. v. BAIRD, et al., County Collectors.
CHICAGO EDISON CO. v. RAYMOND et al., County Collectors.
CHICAGO CITY RY. CO. v. SAME. PEOPLE'S GAS LIGHT
& COKE CO. v. SAME. CHICAGO TEL. CO. v. SAME.

(Circuit Court, N. D. Illinois, N. D. April 4, 1902.)

1. TAXATION—ASSESSMENT—CORPORATIONS—VALUATION OF CAPITAL STOCK—
METHOD OF ASCERTAINMENT.

The value of the capital stock of a corporation and its franchise
for the purpose of taxation is determined by ascertaining the true net
earnings, which is the gross earnings reduced by the annual expendi-
tures, increased debts, and the current depreciation in its tangible prop-
erty, and by capitalizing such net earnings at the ratio of 6 per cent.,
and equalized to the assessment of the other property of the state.

2. SAME—STATE BOARD OF EQUALIZATION—ASSESSMENT OF CAPITAL STOCK—
EQUALIZATION.

Const. Ill. art. 9, § 1, which provides that the value of the taxable
property shall be ascertained by persons elected or appointed as directed
by law, and which confers upon the general assembly the power to tax
corporations owning or using franchises, with the limitation that the tax
shall be uniform as to the class on which it operates; and Hurd's Rev. St.
1899, c. 120, §§ 3, 4, which require that real property shall be valued at
its fair cash value, and that personalty, except as otherwise provided,
shall be valued at its fair cash value, and which direct that the state
board of equalization shall determine the fair cash value of the capital
stock of corporations,—establish uniformity in taxation, and make the
state board of equalization the original body to assess corporate capital
stock, as well as the body which must equalize the assessment of all
property, including such capital stock.

3. SAME—REASSESSMENT FOR 1900—RESULT OF FICTITIOUS JUDGMENT—WRONG
METHOD—RIGHTS OF PARTIES ASSESSED.

The Illinois state board of equalization, pursuant to the mandate of
the state courts, reassessed the capital stock of certain corporations and
their franchises for the year 1900. Such reassessments were from 30 to
47 per cent. higher than the assessments for 1901. The board endeavored
to approximate the aggregate indebtedness of the corporations and their
capital stock as measured by the stock market quotations for April 1,
1900. The reassessments, if made upon the basis of a capitalization of
the net earnings by 6 per cent., would approximate the assessments for
the year 1901. Held, that the reassessments did not express the result
of the board's independent quasi judicial judgment, but were in fact
fictitious, involving mistake, fraud, or coercion, threatening to deprive
the corporations of their property without due process of law and of the
equal protection of the law, entitling such corporations to equitable relief.

4. SAME—EQUITABLE RELIEF—INJUNCTION.

Equity will enjoin the collection of the taxes levied on such assess-
ments, for the constitutional guaranties that one shall not be deprived
of his property without due process of law, and shall be entitled to the
equal protection of the laws, does not merely authorize a suit for the
recovery of the payment of the illegal taxes.

5. SAME—CONDITION OF GRANTING INJUNCTION—PAYMENT OF TAXES LEVIED ON
A PROPER ASSESSMENT.

Since the issuance of an injunction is a matter of discretion and right,
the court will require that the corporations shall pay the taxes for the
year 1900 on the basis of their net earnings capitalized at a ratio of 6

per cent. and equalized by the reduction of 30 per cent., and then divided by 5, as a condition precedent for the granting of the injunction restraining the collection of the taxes levied on the state board's reassessments for the year 1900.

John S. Miller, J. P. Wilson, E. R. Bliss, Holt, Wheeler & Sidley, Sears, Meagher & Whitney, W. W. Gurley, Henry Crawford, and W. R. Crawford, for complainants.

Frank L. Shepard, Edwin W. Sims, and Wm. F. Struckman, for defendant S. B. Raymond, county collector, etc.

H. J. Hamlin, Atty. Gen., and E. S. Smith, Asst. Atty. Gen., for defendant state board of equalization.

Charles M. Walker, Corp. Counsel, and Henry Scholfield, Asst. Corp. Counsel, for defendant city of Chicago.

Before GROSSCUP, Circuit Judge, and HUMPHREY, District Judge.

GROSSCUP, Circuit Judge. The complainants are utility corporations organized under the laws of Illinois, and operating in Cook county, Illinois. The defendants are the County Treasurer of Cook county, the local Town Collectors, and, in the first two cases, the State Board of Equalization. There exists in none of the cases, therefore, the diversity of citizenship that confers jurisdiction on the Federal court.

The substance of the bill in each case is as follows:

That at the annual meeting of the State Board of Equalization for 1900, the capital stock of the complainant corporations, including their franchises, was assessed according to law; that on the basis of such assessments the taxes for the year 1900 were paid; that, subsequently, upon the relation of certain citizens of Illinois, mandamus proceedings were instituted in the Circuit Court for Sangamon County against the State Board of Equalization, charging that the board had, in respect of these assessments, illegally neglected and refused to discharge its duty, in that such assessments fell far below the real value of capital stock of the complainant companies; that on or about the first day of May, 1901, final judgment was rendered in said cause, directing a writ of mandamus to issue against the members of the State Board, requiring it to convene forthwith to reassess such capital stock, including the franchises, at their fair cash value, as of the first of April, 1900, "arriving at such valuation from the best information obtainable, taking into consideration, among other things, the market value of the shares of stock of each corporation and the total amount of its indebtedness, except for current expenses." Upon appeal to the Supreme Court of Illinois this decree was affirmed. 61 N. E. 339. But in neither the Circuit Court nor the Supreme Court were the complainant corporations parties to the suit.

In pursuance of this mandate, the State Board of Equalization for the year 1901, successor in office to the board of 1900, but largely changed in individual membership, at its regular meeting for the year 1901 purported to re-assess the capital stock, including franchises, of the complainant corporations; and it is to restrain the

collection of additional taxes on the basis of these re-assessments that these suits are brought.

In substance, it is averred that such re-assessments, if enforced, would deprive the complainant corporations of their property without due process of law, and deny to the complainant corporations the equal protection of the laws. Upon these provisions of the Constitution of the United States the jurisdiction of the Federal courts is predicated—the contention being that the cases arise, within the meaning of the Judiciary Act, under the Constitution and laws of the United States.

Upon a previous motion, in the traction company cases pending in the Southern District (112 Fed. 607), we held that stock market quotations, though significant indicia of the value of capital stock, are not the absolute, ultimate measure of such value; that the real purpose of the Illinois statute is to reach capital stock subject to taxation, in accordance, not with the stock market quotation upon segregated shares of stock upon a single day in the year, but according to its stable value as an entirety; that such was the real purpose and judgment of the Supreme Court of the State in the mandamus case; whence, it followed, that the said board, itself an independent tribunal, was not shorn by the decision of the State Court of its right and duty, upon its own judgment, to ascertain the real value of the property to be assessed.

The fundamental question of fact involved in the present hearing in each of these cases is this: Did the State Board of Equalization, without fraud or mistake, and free from coercion, exercise its judgment in the making of the re-assessments complained of? In solving this question we have looked into, not only the re-assessments complained of, but also the assessments for the year 1901. A comparison between these records of the State Board is significant. In the case of the Chicago Union Traction Company, the assessment for the year 1901—capital stock and tangible property aggregated—falls from a little over fourteen millions of dollars (the re-assessment for 1900) to about eight millions, two hundred and fifty thousand dollars—a loss of about forty per cent.

In the case of the Chicago Consolidated Traction Company, the depreciation is from a little over three millions, seven hundred and fifty thousand dollars to about two millions of dollars, or about forty-seven per cent.

In the case of the People's Gas Company, the depreciation is from over twelve millions and a half to about eight millions and a half, or about thirty-two per cent.

In the case of the Chicago City Railway, the depreciation is from a little over six millions to a little over four millions and a quarter, or about thirty per cent.

In the case of the Chicago Telephone Company, the depreciation is from a little less than two millions, six hundred thousand dollars to a little over one million, seven hundred thousand dollars, or about thirty-four and one-half per cent.

In the case of the Chicago Edison Company, the depreciation is from a little over two millions, four hundred thousand dollars, to a

little over one million, three hundred thousand dollars, or about forty-six per cent.

In the case of the South Chicago City Railway, the depreciation is from nearly five hundred seventy thousand dollars to a little less than three hundred thousand dollars, or about forty-seven per cent.

These assessments, so widely divergent, were upon the same properties, by the same board, entered almost on the same day. The dates as of which they spoke were, it is true, a year apart; the one being of the first of April, 1900, the other of the first of April, 1901. But the tide of stock quotations, and the tide of current values, were higher on the latter day than the former. If, between these two assessments, a considerable disparity should exist, the increase ought to be found in the assessment for 1901, and not in that for 1900.

We can comprehend a possible state of facts showing that neither of these assessments embodied the real judgment of the State Board. We can comprehend, also, a state of facts showing that either one or the other may have embodied the board's real judgment. But both can not be vindicated. In the very nature of things, one or the other has been made up under some species of fraud, mistake or coercion; and a few pregnant circumstances convince us that whatever may be said of the assessment for 1901, the re-assessment for 1900 can not be accepted as the independent judgment of the State Board.

One of these is this: The re-assessment of each of the complainant corporations for 1900 is a close approximation to the aggregate of its indebtedness and its stock value, as measured by the stock market quotations for April 1, 1900. The board seems to have adopted as its own standard in the making of these re-assessments the stock exchange record of that one day of the three hundred and sixty-five, and to have restricted its function to the mere arithmetic of adding up the figures of that day's record. In so doing the board followed, possibly, the interpretation put upon the mandate by the State circuit judge; or, the board may, in the exercise of its own judgment, have so interpreted the mandate; or, it may have felt that, under all the circumstances, an assessment according to that standard was the safer course for the members personally. But, on either supposition, the significance of the fact is not lessened. It goes far toward convincing us that the objective of the board was not the real value of the properties as entireties, but simply what the stock market for one day indicated the value to have been.

What was the real value, in fact, of the property re-assessed? A determination, approximately, of this fact will aid materially in determining whether the board, in the adoption of the standard referred to, exercised its real judgment as an independent tribunal in search of the value of the stock as an entirety. To arrive at such value we have looked into the earnings of the several complainants for the year 1900. The disclosures are made from the books of the company kept for the information of the stockholders. They seem to have been kept with no reference, prospectively, to tax valuations. In the absence of better data, we feel justified in accepting them for the purposes of this motion—subject, of course, to any inquiry that may

affect their accuracy. Except in the case of the Union Traction Company, it is not shown whether the net earnings thus reported have made allowance for current depreciation in the tangible property. In the case of the Union Traction Company, by our direction, an annual reduction, equal to six per cent of the current value of cars, tracks and machinery has been allowed. This is not, in our judgment, an excessive allowance. Railway companies make such reduction each year on the book value of their cars; and it is the rate for depreciation adopted by the Tax Commissions of some of the States.

Nor do the net earnings reported take into account the increase of tax for the year 1900, occasioned by the re-assessments as they may be finally modified. It is only fair that the earnings should be reduced by such increase—itself an omitted fixed expenditure—before they are used as the basis for capitalization.

Several other elements in a fair calculation, based on net earnings, have raised questions to which we have given careful consideration. The first of these is upon what rate of the true net earnings the aggregate value of the property should be capitalized. We have fixed the rate at six per cent. That is the rate adopted in states where assessments are made upon the basis of net earnings. It is less than the rate that some advanced advocates of municipal ownership are willing to guarantee to investors in securities of this character. The rate adopted, is, we think, justified by the considerations that usually attend the real investors' purchase of stock. Commonly, net earnings are applicable, first, to preferred securities, such as bonds or preferred stock. We may assume that the preferred half of a capitalization that earns as an entirety, six per cent may be considered worth par upon the basis of five per cent. But when it comes to second half, involving as it does, much more the uncertainties of the future, the security will not commonly be regarded as good at par upon the basis of even six per cent, unless there is a margin of earnings over and above the dividends paid; for no investor feels secure of a dividend at six per cent next year, simply because the company has earned it this. It is probably fair to say that net earnings, accruing through several years, at the rate of five per cent upon the preferred half of the securities, and of seven per cent upon the remaining half, would make both securities worth their par value; and this would be equivalent to six per cent upon the whole.

Another element entering into the calculation is this: Should the capitalization, thus arrived at, be equalized to the assessment of the other property of the State? The record convinces us that the assessment of other property throughout the State, including railroad, for the year 1900, as finally equalized by the State Board of Equalization, did not exceed seventy per cent of the cash value; and that such standard was not adopted by the State Board unintentionally or through inadvertence, but deliberately, as a means of arriving at an equalization of taxable values generally throughout the State. May the board now, or the court in review of the board, upon these re-assessments disregard this standard? We think not, and to that question have given careful inquiry.

114 F.—36

The Illinois law, constitutional and statutory, upon the subject is substantially the following:

"The general assembly shall provide such revenues as may be needful by levying a tax by valuation so that every person and corporation shall pay a tax in proportion to the value of his, her or its property, such value to be ascertained by some person or persons to be elected or appointed in such manner as the general assembly shall direct and not otherwise; but the general assembly shall have power to tax * * * insurance, telegraph and express interests or business, venders of patents and persons or corporations owning or using franchises and privileges in such manner as it shall from time to time direct by general law, uniform as to the class upon which it operates." Const. 1870, art. 9, § 1.

"Real property shall be valued as follows: First, each tract or lot of real property shall be valued at its fair cash value estimated at the price it would bring at a fair voluntary sale." Hurd's Rev. St. 1899, c. 120, § 4.

"Personal property shall be valued as follows: First, all personal property, except as herein otherwise directed, shall be valued at its fair cash value. * * * Fourth, the capital stock of all companies or associations now or hereafter created under the laws of this State, except those required to be assessed by the local assessors and hereinafter provided, shall be so valued by the State Board of Equalization as to ascertain and determine respectively the fair cash value of such capital stock, including the franchise, over and above the assessed value of the tangible property of such company or association," arriving at such valuation from the best information obtainable, taking into consideration, among other things, the market value of their shares of stock and the total amount of their indebtedness. Hurd's Rev. St. 1899, c. 120, § 3; State v. State Board of Equalization (Ill.) 61 N. E. 339.

These provisions, read together, disclose plainly enough the policy of the State respecting the listing of property for taxation. The General Assembly is given power, it is true, to set, as a class apart, persons or corporations owning or using franchises and privileges, and, so doing, to tax them either upon a valuation, or at a ratio, different from the other classes of property of the State. But until the legislative will is thus exercised all the property of the State is to bear uniformly the burdens of taxation. Uniformity is the dominating mandate of the Constitution. It is the prime maxim in almost every system of taxation, where justice and fair play are sought. It will not be interpreted out of the State's policy unless a clear legislative intention to that end is evinced.

Has the General Assembly in any of the acts referred to evinced an intention to depart from this general mandate of the Constitution and this general maxim of taxation generally? In this connection, two features of the revenue law are pointed out to us. It is said that by section three, above quoted, the capital stock of persons and corporations, such as complainants, are to be so valued by the State Board as to ascertain their fair "cash value;" also that the provisions relating to the listing of railroad rolling stock, tracks, etc., in the several taxing districts show that railroads, at least, are to be regarded as a class apart. But neither of these features of the revenue law prove the point claimed. The second relates plainly, not to standards of valuation, or to uniformity or want of uniformity therein, but to the distribution among the districts of the fruits of taxation by whatever standard laid. The first—the cash value clause —is equally inconclusive when a comprehensive view of the entire taxing machinery of the State is taken.

That machinery begins with the listing of the property subject to taxation. This ordinarily is done by the local assessors, and extends to all classes of real property, moneys, credits, stocks and personal property generally. It is the first step towards ascertaining each citizen's rightful proportion of contribution due to the State under the constitutional provision already quoted.

But this assessment is made by different men in different districts. They may entertain divergent conceptions respecting the value of the same kinds of property; they may be unfairly prejudiced against individual tax-payers and unfairly inclined to favor others. To counteract the unequal conditions thus made possible, County Boards, or Boards of Review, have been created. It is the function of these boards to examine the assessments as of individuals, with a view to the correction of errors and inequalities, and to examine them as a whole with a view to determine their relative equality as between the different primary taxing districts. This is the first process of equalization, and its prime purpose is to insure uniformity as between people of the same general taxing district.

But these local reviewing boards may themselves have divergent views respecting the values of the same kind of property, and thus, unless there be a central Board of Equalization, there might creep in, as between the different general taxing districts of the State, inequalities in taxation. Hence, a final reviewing board—the State Board of Equalization. It is elected, one member from each congressional district, and its general function is to bring the assessments of the several districts to the same relative standard, so that no district of the State may be compelled to pay a disproportionate part of the State's taxes. It has no power to pass over the heads of the local equalizing boards to reach or change individual assessments. Its sole function is to bring about, as nearly as possible, a common level in the valuations throughout the State. Here, again, the prime purpose of the provision is uniformity.

Now, when the General Assembly came to laying a tax upon the capital stock of franchise corporations, there arose the necessity of lodging the power of initial assessments somewhere in the States' machinery. The assessment initially of the tangible property of these franchise corporations was left with the local assessors. But in the assessment of the capital stock, as an entirety, a difficulty appeared not present in the assessment of local properties. The franchise corporations, in great part, are the railways of the State. They cross her entire area—north and south, east and west—running in and out of taxing districts. The capital stock of each, as distinguished from its tangible property, is in its nature an entirety, and its valuation for taxing purposes could not, therefore, in the very nature of things, be cut up into taxing districts. For the assessment of the capital stock of such corporations the initial assessor must necessarily be one whose jurisdiction comprehends the entire line within the State.

But though the section in question made the State Board, in this class of properties, the initial assessor, and charged it with assessing such capital stock at its fair cash value, nothing, either in terms or by inference, is, by the section, taken from the board's general func-

tion and duty as an equalizer. There is in the section no evidence that the general assembly intended to deprive the board of this duty of equalization respecting capital stock. The employment of the words "cash value" is not in point; for cash value is made the primary basis of the valuation of other properties—properties finally equalized below such value—as well. Plainly, the one thought in the mind of the general assembly in enacting section three was, in addition to laying such tax, to find a place where the power of initial assessment could be lodged so as to be effectively used; not intending thereby to throw out of adjustment the equalizing functions of the taxing machinery. In our opinion, uniformity is still the statutory policy of the State in the levying of taxes, with respect of franchise corporations, as well as of other properties. Accordingly, it was imperative, that before the re-assessments for 1900 were entered there should have been such deductions as would have equalized the valuation adopted with the valuations placed upon the other properties of the State. This can not be questioned, on any view, to the extent that such deduction was necessary to equalize the assessment of the complainant corporations with the assessments of railroad corporations for the same year.

Now, if we take the net earnings for 1900 (and this year does not appear to have been an exceptional one) as the basis of valuation, capitalize them at the ratio named—six per cent—equalize this with the other property of the State by deducting thirty per cent, and then divide by five, according to the law in force, adding thereto the tangible property, we will arrive approximately at the real figures at which the re-assessments, including tangible property, should have been entered. Allowance, however, in these net earnings must be first made for the payment of the increased taxes, for, to that extent, the net earnings reported do not disclose a fixed expenditure of the company for that year. The result in round figures can be stated as follows:

The re-assessment for the Chicago Union Traction Company should have been about seven millions seven hundred and sixty-three thousand dollars, or about six millions two hundred and fifty thousand dollars less than the re-assessment complained of, and within four and one-half per cent of the assessment of 1901.

That of the Chicago Consolidated Traction Company should have been about six hundred and twenty-one thousand dollars, or about three millions two hundred thousand dollars less than the re-assessment complained of.

That of the People's Gas Company should have been about eight millions five hundred and one thousand dollars, or about four millions one hundred and thirty thousand dollars less than the re-assessment complained of, and within two per cent of the assessment for 1901.

That of the Chicago City Railway Company should have been about four millions and fifteen thousand dollars, or about two millions one hundred and eight thousand dollars less than the re-assessment complained of, and within five per cent of the assessment for 1901.

That of the Chicago Telephone Company should have been about one million eight hundred and fifty thousand dollars, or about seven hundred and fifty thousand dollars less than the re-assessment complained of, and within seven per cent of the assessment for 1901.

That of the Chicago Edison Company should have been not to exceed one million eight hundred thousand dollars, or more than six hundred thousand dollars less than the re-assessment complained of.

The South Chicago City Railway Company shows no net earnings; indeed, it seems to have been operated at a loss. There is no basis, therefore, upon which to assess the capital stock over and above tangible property.

Now, what do these comparisons show. The disparity between the re-assessments complained of and the figures at which they should have been entered, upon the basis of net earnings, runs from thirty to forty-seven per cent. In cases where the disparity is about thirty per cent we might entertain the explanation that the board felt itself under no obligation to equalize the re-assessments with the property of the other State, hence the disparity. But, considered in connection with the other facts disclosed, the explanation is untenable. It does not explain the action of the board in cases where the disparity runs as high as forty-seven per cent; and it is contradicted by the view of the board, entertained three weeks later, in the assessment for the year 1901 when equalization was allowed. A significant circumstance, too, tending to show what was the real judgment of the board as between the re-assessments complained of and the assessments for 1901, is the fact that except in the case of the Edison Company the assessments for 1901 run only from two to seven per cent apart from our calculation of assessments based upon earning power.

The sum of it all is, that by whatsoever causes brought about, the re-assessments complained of did not, in our opinion, express the real judgment of the State Board as an independent tribunal, and were, therefore, in effect, fictitious judgments, for the impeachment of which, somewhere, the law holds out opportunity to the parties injured. Is the remedy prayed for in the bills within the complainants' legal opportunities?

Taxes are enforced contributions, levied by the State upon the property of individuals, by virtue of its sovereignty, for the support of government, and for the public needs. The money thus taken, until taken, is, as much as real estate or chattels, property within the meaning of the Constitution of the United States; and the taking of such money is a taking of property, as much so, for instance, as the taking of private land for some public work authorized by some law of the State or of Congress.

Due process of law, as applied to the cases under consideration, is the authorized procedure whereby the property of the individual can be taken by the State; it includes the initial authority to levy taxes; the purpose to which money thus raised is to be devoted; and the instrumentalities that distribute the burden upon the citizens. Ours is a government of laws, and not of individual officers, or of boards, or of men.

Any substantial departure, therefore, in the collection of taxes, from the law, either as to the authority for a tax, or its purpose, or the provisions for the just distribution of its burdens, is a departure from due process of law; and the enforced collection of taxes, in the laying and distributing of which there is a substantial departure from law, is the depriving of a citizen of his property without due process of law.

A substantial step in the taxing process as fixed by the law of Illinois; a step essential to the equal distribution of the burdens of taxation; is the decision and judgment of the State Board of Equalization. The Board's place in the taxing system is that of a quasi judicial body. Its judgment affects, as keenly as that of any court, the property interests collectively, of the several districts of the State, and, directly and individually, of the persons and corporations owning franchises. No court can by its judgment grasp more completely what would otherwise remain the property of the individual. In no other tribunal can there be found apter illustration of the power of the State to compel the individual to deliver up his property under the stress of law. It needs no argument to show that power, such as this, is only exercised rightly when exercised judicially.

The prime quality of every judgment, without which it is no judgment, is, that it is the final thought of the judge on the subject submitted, unaffected by extrinsic influences. This implies freedom of mind—not merely theoretically, but practically—the freedom of a mind that does not fear, that has no wish of its own, that sees nothing not seen through the lenses of the law. Judgments honestly made up in such an atmosphere, though subject to review for error, are due process of law; judgments affected by fraud or fear, however, solemnly entered, are as nothing, when weighed by the constitutional guaranties thrown around liberty and property.

The sum of all this, as applied to the cases under consideration, is that the reassessments complained of do not embody the real judgment of the board, in either the assessment or the equalization of the capital stock of complainants for the year 1900; and that in the absence of such real judgment, the threatened collection of taxes on the basis of the fictitious entry, would be to deprive complainants of their property without due process of law.

We have no doubt that complainants may intrench themselves against this invasion by the writ of injunction. One of the primary grounds of equity jurisdiction is to reach cases involving mistake, fraud or coercion, and the relief necessary to their correction. The cases under consideration come clearly within this jurisdiction. It is incomprehensible that the complainants may not avert this threatened invasion of their rights—that they must first yield and then turn prosecutors in a court of law to recover their loss. The fundamental guarantees of the Constitution must not be thus emasculated.

But injunctions issue as a matter of discretion and conscience, not of right. The court may always attach equitable conditions, and the cases under consideration present to our minds a situation where conditions should be required.

We are not unmindful of the fact that the original assessments for 1900 were much less than any fair administration of the law would have made them; and that complainants can not justly escape responsibility for this evasion of their just share of the burdens of taxation. Nor may we shut our eyes to a fact known to all others, that the school funds of the county—the first and most needful outlay for our rising citizenship—are running low, partly in consequence of the taxes withheld. Before the injunction issues, therefore, we shall require the payment to the proper officers by the complainants of their taxes for the year 1900, according to the following rule:

The basis shall be the true net earnings of the several complainants for the year covering April 1, 1900, proper allowance being made for depreciation and replacement, but not for extensions; and reduced further by the amount of additional taxes that the enforcement of this rule produces. Upon this basis the value of complainants' capital stock, including franchises and tangible property, shall be capitalized on a ratio of six per cent; this equalized by reduction of thirty per cent; and then divided by five. The sums thus produced will be regarded as the true re-assessments for the year 1900. Upon this the tax will be extended at the true rate for 1900, exclusive of interest and penalties, not to exceed eight and thirty-seven hundredths per cent from which will be subtracted the taxes already paid, and the balance will be the sum required. We allow no penalties, for the reason that the re-assessments complained of are void, and complainants could not reasonably pay until a proper basis was fixed, either by the board or the courts.

When the cases come to final decree, we will require, before entering such decree, the payment by complainants of the costs of the suit.

The cases in the Southern District will be referred to Walter W. Allen, and those in the Northern District to Henry W. Bishop, masters, to make the calculations indicated, with power to employ such experts or actuaries as they may deem needful.